IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED

2003 DEC 23 P 12: 35

U.S. DISTRICT COURT
DISTRICT OF MASS.

**03 12595 MEL**

ZACHARY ALAN STARR,
derivatively on behalf of the
MASSACHUSETTS INVESTORS TRUST
and the MASSACHUSETTS INVESTORS
GROWTH STOCK FUND.
      **Plaintiff**

      v.

MASSACHUSETTS FINANCIAL SERVICES
COMPANY, SUN LIFE ASSURANCE
COMPANY OF CANADA – U.S.
OPERATIONS HOLDINGS, INC., SUN
LIFE FINANCIAL (U.S.) HOLDINGS, INC.,
SUN LIFE FINANCIAL (U.S.) INVESTMENTS
LLC, SUN LIFE OF CANADA (U.S.)
FINANCIAL SERVICES HOLDINGS, INC.,
JOHN W. BALLEN, JEFFREY L. SHAMES,
KEVIN R. PARKE, LAWRENCE H. COHN,
WILLIAM R. GUTOW, J. ATWOOD IVES,
ABBY M. O'NEILL, LAWRENCE T. PERERA,
WILLIAM J. POORVU, J. DALE SHERRATT,
ELAINE R. SMITH, WARD SMITH,
JOHN DOES 1-50, JOHN DOES 51-100

      **Defendants**

      and
the MASSACHUSETTS INVESTORS TRUST
and the MASSACHUSETTS INVESTORS
GROWTH STOCK FUND

      **Nominal Defendants**

CIVIL ACTION NO.

MAGISTRATE JUDGE Collings

**JURY TRIAL DEMANDED**

AMOUNT $ 150
SUMMONS ISSUED yes - 20
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _Kowt_
12/23/03

**DERIVATIVE COMPLAINT**

COMPL.

Plaintiff, Zachary Alan Starr, derivatively on behalf of the Massachusetts Investor Trust and the Massachusetts Investors Growth Stock (collectively the "Funds") hereby complains against the Defendants as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to Section 44 of the Investment Company Act of 1940 ("Investment Company Act"), 15 U.S.C. § 80a-43; Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa; and 28 U.S.C. § 1331.

2.     This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims asserted herein, because they arise out of and are part of the same case or controversy as the federal claims alleged.

3.     Venue is proper in this judicial district because some or all of the Defendants conduct business in this district and some of the wrongful acts alleged herein took place or originated in this district.

4.     In connection with the acts and practices alleged herein, Defendants directly or indirectly used the mails and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets and national securities exchanges.

## PARTIES

### Plaintiff

5.     Plaintiff Zachary Alan Starr, a resident of East Quogue, New York, purchased shares of the Massachusetts Investor Trust and the Massachusetts Investors Growth Fund prior to December 1, 2002, and continues to hold such shares.

**MFS Defendants**

6.     Defendant Sun Life Assurance Company of Canada U.S. Operations Holdings, Inc. ("Sun Life Assurance") is a wholly owned subsidiary of Sun Life Financial, Inc., a Canadian corporation. Sun Life Assurance has its headquarters located at One Sun Life Executive Park, Wellesley Hills, Massachusetts 02481.

7.     Defendant Sun Life Financial (U.S.) Holdings, Inc. ("Sun Life Holdings") is a wholly owned subsidiary of Sun Life Assurance. Sun Life Holdings is also headquartered at One Sun Life Executive Park, Wellesley Hills, Massachusetts 02481.

8.     Defendant Sun Life Financial (U.S.) Investments LLC ("Sun Life Investments") is a wholly owned subsidiary of Sun Life Financial.  Sun Life Investments is also headquartered at One Sun Life Executive Park, Wellesley Hills, Massachusetts 02481.

9.     Defendant Sun Life of Canada (U.S.) Financial Services Holdings, Inc. ("Sun Life Financial Services") is a 99.7% owned subsidiary of Sun Life Investments, and is also headquartered at One Sun Life Executive Park, Wellesley Hills, Massachusetts 02481.

10.     Defendant Massachusetts Financial Services Company ("MFS" or the "Advisor") is a 92% owned subsidiary of Sun Life Financial Services.  MFS is one of the largest equity managers in the United States, specializing primarily in growth, core and international equity investing.  MFS and its predecessor organizations have a history of money management dating from 1924. MFS (together with its predecessors) has served as the investment advisor to the Funds and provided the Funds with investment management and related administrative services and facilities, including portfolio management and trade execution, since the Funds' inception. For these services, MFS pays itself a management fee from the assets of the Funds.  Net assets under the management of the MFS organization are approximately $134 billion.  MFS is located at 500 Boylston Street, Boston, Massachusetts  02116.

11.    Defendant John W. Ballen ("Ballen") is Chief Executive Officer of MFS, and in that capacity he is and was ultimately responsible for the actions of MFS.

**John Does 1-50**

12.    The true identities, roles and capacities of John Does 1-50 (the "MFS Fiduciary Defendants") have yet to be ascertained. Included as MFS Fiduciary Defendants are insiders, i.e. employees and executives, of the Sun Life Defendants, the MFS defendants, the Massachusetts Investor Trust and the Massachusetts Investors Growth Fund, but not limited to, fund managers, advisors, brokers and sales executives who, because of their relationship to the Funds had a fiduciary duty to the Funds, and breached such fiduciary duty through their participation and facilitation of the market timing scheme alleged herein.

**John Does 51-100**

13.    The true identities, roles and capacities of John Does 51-100 have yet to be ascertained. Included in John Does 51-100 are hedge funds, hedge fund managers, brokerage firms and fiduciaries to the Funds who participated, exploited and perpetrated the unlawful trading in the Funds and knowingly violated the policies established, though not enforced because of the breaches of the MFS Fiduciary Defendants, by the Funds. In addition, it includes those entities and individuals who conspired and assisted in exploiting the opportunities provided by the MFS Defendants to make illicit trades in the Funds. Such defendants directly or indirectly profited by their own, or others', ability to engage in improper late trading and timing at the expense of non-participating MFS Mutual Funds investors. Furthermore, John Does 51-100 actively enticed the MFS Defendants to breach the fiduciary duties owed to the Funds through numerous means including the deposit of assets in other MFS financial vehicles in exchange for

the right to make short-term trades in the Funds. The identities of John Does 51-100 will be disclosed in amendments to this complaint when the true identities are discovered.

**Trustee Defendants**

14.    The Individual Defendants named are each Trustees of the Massachusetts Investor Trust and the Massachusetts Investors Growth Fund (see below).

      (a)    Jeffrey L. Shames, Chair
             Chairman of MFS

      (b)    John W. Ballen,
             Chief Executive Officer and Director of MFS

      (c)    Kevin R. Parke
             President, Chief Investment Officer, and Director of MFS

      (d)    Lawrence H. Cohn

      (e)    William R. Gutow

      (f)    J. Atwood Ives

      (g)    Abby M. O'Neill

      (h)    Lawrence T. Perera

      (i)    William J. Poorvu

      (j)    J. Dale Sherratt

      (k)    Elaine R. Smith

      (l)    Ward Smith

The Trustees select the officers of the Trusts, have a fiduciary duty to the Trusts and their beneficiaries and a duty to maintain the safety of the assets of the Trusts. Each Trustee serves as Trustee for the each of the 17 trusts that represent the 66 mutual funds within the MFS Family of Funds. The address of the Trustees and the Trusts is 500 Boylston Street, Boston, Massachusetts 02116.

**Nominal Defendants**

15.     Nominal Defendant Massachusetts Investor Trust is a mutual fund organized as a Massachusetts business trust and is registered under the Investment Company Act as an open-end management investment company. The Trust is managed and advised by MFS.

16.     Nominal Defendant Massachusetts Investors Growth Fund is a mutual fund organized as a Massachusetts business trust and is registered under the Investment Company Act as an open-end management investment company.   The Fund is managed and advised by MFS.

17.     The defendants described in paragraphs 6-9 are referred to as the "Sun Life Defendants."   The defendants described in paragraphs 6-11 are referred to as the "MFS Defendants."   The defendants described in paragraphs 15-16 are referred to as the "Nominal Defendants" or the "Funds."   The defendants described in paragraph 14 are referred to as the "Trustee Defendants."   The defendants described in paragraph 12 are referred to as the "MFS Fiduciary Defendants."   All of the defendants together are referred to as the "Defendants."

## PRELIMINARY STATEMENT

18.     This derivative action is brought to recover damages for injuries to the Massachusetts Investor Trust and the Massachusetts Investors Growth Fund caused by the Defendants' willful breaches of fiduciary duty and unlawful and manipulative trading activities and devices in the Funds which operated as a fraud and deceit on the Plaintiffs and the Nominal Defendants (hereafter together "Plaintiff").

**Fiduciary Duty**

19.     Each of the MFS Defendants and the Trustee Defendants owed to the Funds and their shareholders the fiduciary duties of loyalty, candor and fair dealing, and under the Investment Company Act, the duty to refrain from charging or collecting excess compensation or

other payments for services in order to preserve the Funds' property and assets, owed the duty

not to place their own financial interests above those of the Funds and their shareholders, and

owed the Funds and their shareholders the duty of full and candid disclosure of all material facts

thereto.

### Manipulative Devices

20.    Like all other mutual funds, the Funds' shares are valued once a day, at 4:00 p.m.

Eastern Time, following the close of the financial markets in New York. The price, known as

the Net Asset Value ("NAV"), reflects the closing prices of the securities that comprise a

particular fund's portfolio plus the value of any uninvested cash that the fund manager maintains

for the fund. Thus, although the shares of a mutual fund are bought and sold all day long, the

price at which the shares trade does not change during the course of the day. Orders placed any

time up to 4:00 p.m. are priced at that day's NAV, and orders placed after 4:01 p.m. are priced at

the next day's NAV. This practice, known as "forward pricing," has been required by law since

1968.

### Late Trading

21.    Because of forward pricing, mutual funds are susceptible to a manipulative

practice known as "late trading." Late trading is the unlawful practice of allowing some

investors to purchase mutual fund shares **after** 4:00 p.m. at that day's NAV, even though such

after-hours trades should be priced at the next day's NAV. Late traders seek to take advantage

of events that occur after the close of trading on any given day, while purchasing shares of

mutual funds at prices that do not take those events into consideration. For example, if a mutual

fund invests in the stock of a particular company that announces positive results at 5:00 p.m.

after the close of trading, a late trader gets to buy shares of that mutual fund at the 4:00 p.m.

price, which does not reflect the favorable information. When trading opens the next day, the

price of the affected company's stock will rise, causing the fund's NAV to rise. The late trader can either hold onto his mutual fund shares, acquired at yesterday's cheaper price, or sell those shares and realize an immediate profit.

22.     "Late trading can be analogized to betting today on yesterday's horse races."[1] The late trader's arbitrage profit comes dollar-for-dollar out of the mutual fund that the late trader buys. When the late trader redeems his shares and claims his profit, *the mutual fund manager has to either sell stock, or use cash on hand -- stock and cash that used to belong in the fund -- to give the late trader his gain.* The late trader's profit is revenue withheld from the mutual fund. The forward pricing rule was enacted precisely to prevent this kind of abuse. *See* 17 C.F.R. §270.22c-1(a).

**Timing**

23.     Another manipulative practice used by Defendants to exploit mutual fund pricing is known as "timing," which involves short-term "in-and-out" trading of mutual fund shares. One timing scheme is "time zone arbitrage," which takes advantage of the fact that some funds use "stale" prices to calculate NAV. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated. A typical example is a U.S. mutual fund that invests in Japanese companies. Because of the time zone difference, the Japanese market closes at 2:00 a.m. New York time. When the NAV is calculated at 4:00 p.m. in New York, it is based upon market information that is fourteen hours old. If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it opens later, the stale Japanese prices will not reflect the price change and the fund's NAV will be artificially low. Put another way, the NAV does not reflect the true current market value of the stocks held by the fund. On such a day, a trader who buys

---

[1] *State of New York v. Canary Capital Partners et al.*, Supr. Ct. of N.Y., Complaint ¶ 10.

the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling. By "timing" the fund, an investor seeks to earn repeated profits in a single mutual fund.

24. Another "timing" scheme is "liquidity arbitrage." Under this scheme, a trader seeks to take advantage of stale prices in certain infrequently traded investments, such as high-yield bonds or the stock of small capitalization companies. The fact that such securities may not have traded for hours before the 4:00 p.m. closing time can render the fund's NAV stale, and thus open it to being timed.

25. The device of "timing" is inconsistent with and inimical to the purpose for mutual funds as long-term investments. Mutual funds are designed for buy-and-hold investors, and are therefore the preferred investment instruments for many retirement and savings accounts. Nonetheless, certain investors attempt to make quick in-and-out trades in order to exploit the inefficiency of mutual fund pricing. The effect of "timing" is to artificially increase the frequency of transactions in a mutual fund, and consequently increase the fund's transaction costs substantially above what would be incurred if only buy-and-hold investors were trading in the fund's shares. The increased transaction costs, as well as additional capital gains taxes, reduces the assets of the fund and in turn its NAV.

26. Continued *successful* late-trading or timing requires the complicity of a fund's management.

27. The MFS Fiduciary Defendants and John Does 51-100 obtained assistance to engage in the illicit scheme directly from the MFS Defendants. By failing to enforce and/or follow regulations and policies listed in the Funds' prospectuses prohibiting late trading, the MFS Defendants allowed and encouraged John Does 51-100 to rapidly buy and sell MFS Funds, the very funds that defendants and their co-conspirators had the fiduciary duty to oversee and

protect from such malfeasance, in a manner that was explicitly prohibited by the Funds prospectuses. This conduct continued for a substantial amount of time and was well known within MFS and amongst the fiduciaries responsible for the management of the Funds and was merely reflective of the self-dealing that pervaded MFS.

28.     Because of the harm timing can cause, honest fund managers often seek to minimize the disruptive impact of timers by keeping cash on hand to pay out the timers' profits without having to sell stock. However, such efforts by honest fund managers to counter the ill effects of "timing" on their funds do not eliminate the practice, it only reduces it. Indeed, one recent study estimated that U.S. mutual funds lose $4 billion per year to timers. See Eric Zitzewitz, Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds (October 2002), http://faculty-gsb.stanford.edu/zitzewitz/Reseach/arbitrage1002.pdf. While it is virtually impossible for fund managers to identify *every timing trade*, large movements in and out of funds, like those made by John Does 51-100 in the MFS Fund are easily apparent.

29.     Fund managers generally have the power simply to reject timers' purchases. Many funds have also instituted short-term trading fees ("early redemption fees") that effectively wipe out the arbitrage that timers exploit. Typically, these fees go directly into the affected fund to reimburse it for the costs of short term trading. These fees are waived if the fund managers, i.e. MFS, are assisting the timer, or as here, are the active participants in the timing scheme.

30.     In addition, fund managers are required to update NAVs at the end of the day in New York when there have been market moves that might render the NAV stale. This is called giving the fund a "fair value", and eliminates the timer's arbitrage. As fiduciaries for their funds, they are obligated to use their best efforts to employ these available tools to protect their customers from the dilution that timing causes.

## FACTUAL BACKGROUND

31.    MFS Fiduciary Defendants and John Does 51-100 perpetrated the manipulative scheme on the Funds, for an undetermined time period with the complicity of the MFS Defendants.  The scheme, which had started and was actively being encouraged by the year 2001, violated the Investment Advisor's and Fund Manager's fiduciary duties to the funds but gained the Funds' managers substantial fees and other income for themselves and their affiliates, in addition to the substantial profits that were made by the MFS Fiduciary Defendants and John Does 51-100 by engaging in the scheme.  All such profits were made at the expense of Fund shareholders.

32.    MFS is the manager and investment advisor for all of the MFS Mutual Funds. While each mutual fund is in fact a series of shares under a Trust, as a practical matter the Advisor runs all of the funds.  The portfolio managers are all typically employees of the Advisor (who hold office by election of the Trustees) not the mutual funds.  The Advisor, MFS, makes its profit from fees it charges the funds for financial advice and other services.  Such fees are typically a percentage of the assets in the fund, so the more assets in the family of funds, the more money MFS makes. In what has unfortunately become a common mutual fund industry practice[2], the timer frequently offers the fund manager/Advisor more assets in exchange for the right to time.  In return, fund managers (MFS) would allow timers (*e.g.* a hedge fund) to target specific funds, which would be hurt in exchange for additional money in the managers own pockets in the form of higher management fees resulting from the timers placing of assets ("sticky funds") in other Funds offered by the mutual fund company (MFS), usually liquid asset funds.

---

[2] See *State of New York v. Canary Capital Partners et al.*(Supr. Ct. of N.Y. filed Sept. 3, 2003).

33.    The MFS Fiduciary Defendants, employees, representatives, and fiduciaries inside MFS and the Funds, were direct perpetrators, participants, and beneficiaries of the wrongdoing alleged herein. The MFS Fiduciary Defendants and John Does 51-100 obtained assistance to engage in the illicit scheme directly from MFS. By failing to enforce and/or follow regulations and policies listed in the Funds' prospectuses prohibiting late trading, MFS allowed and encouraged John Does 51-100 to engage in rapid short-term trading of the Funds, the very funds that defendants and their co-conspirators had the fiduciary duty to oversee and protect from such malfeasance, in contrivance of the rules and policies explicitly set forth in the Funds prospectus' and in breach of the fiduciary duties owed to the Funds. This conduct continued for a substantial amount of time and was well known within MFS and amongst the fiduciaries responsible for the management of the Funds and was merely reflective of the self-dealing that pervaded MFS.

34.    Although such trading was explicitly prohibited pursuant to the Funds prospectuses, MFS Fiduciary Defendants intentionally did not attempt to police or prohibit the market timing trades.  Rather, the prohibited trading was explicitly permitted by the MFS Fiduciary Defendants as directed in a memorandum issued by MFS Defendants to MFS brokers that sold MFS funds.  The memorandum, issued in early 2001, cleared five of the MFS Mutual Funds for the prohibited trading practices and ordered brokers to accept short-term trades, "even if a pattern of excessive trading has been detected."

35.    Moreover, the MFS Defendants actively encouraged and facilitated these prohibited trades by essentially creating two classes of MFS funds – a small group of large funds that would accept rapid-fire trades and a larger group of international funds that would not.

36.    The Funds publicly maintained a policy prohibiting excessive trading.  For example, the Prospectus for the Massachusetts Investor Trust, filed March 1, 2001 states:

**Excessive Trading Practices**. The MFS funds do not permit market-timing or other excessive trading practices. Excessive, short-term (market-timing) trading practices may disrupt portfolio management strategies and harm fund performance. As noted above, the MFS funds reserve the right to reject or restrict any purchase order (including exchanges) from any investor. To minimize harm to the MFS funds and their shareholders, the MFS funds will exercise these rights if an investor has a history of excessive trading or if an investor's trading, in the judgment of the MFS funds, has been or may be disruptive to a fund. In making this judgment, the MFS funds may consider trading done in multiple accounts under common ownership or control.

37.    MFS later changed the Excessive Trading Policy language in its prospectuses.

The Prospectus for the Massachusetts Investor Trust, dated April 30, 2003, states:

**Excessive Trading Practices.** The MFS funds do not permit market-timing or other excessive trading practices *that may disrupt portfolio management strategies and harm fund performance.* As noted above, the MFS funds reserve the right to reject or restrict any purchase order (including exchanges) from any investor. The MFS funds will exercise these rights, including rejecting or canceling purchase and exchange orders, delaying for up to two business days the processing of exchange requests, restricting the availability of purchases and exchanges through telephone requests, facsimile transmissions, automated telephone services, internet services or any other electronic transfer service, if an investor's trading, in the judgment of the MFS funds, has been or may be disruptive to a fund. In making this judgment, the MFS funds may consider trading done in multiple accounts under common ownership or control. (Emphasis added.)

Identical language is contained in prospectuses for other MFS Mutual Funds.

38.    In the face of such policy and their fiduciary duties, the MFS Defendants knowingly, deceptively permitted and actively facilitated the MFS Fiduciary Defendants' and John Does 51-100 market timing, by engaging in such self-dealing activity and by continuing such relationships with offending individuals to allow them to conduct market timing and other illegal trading in the Funds to the detriment of the Funds. The prohibited trading was explicitly permitted by the MFS Fiduciary Defendants as directed in a memorandum issued by MFS Defendants to MFS brokers that sold the funds. The memorandum, issued in early 2001, cleared five of the MFS Mutual Funds for the prohibited trading practices and ordered brokers to accept short-term trades, "even if a pattern of excessive trading has been detected."

39.    The MFS Fiduciary Defendants and John Does 51-100 realized significant profits as a result of these timing arrangements at the expense of the Funds.

40.    As a result of an investigation by the Securities and Exchange Commission and the New York Attorney General, it was reported on December 9, 2003, that these regulators were planning suits against MFS. Despite the public awareness, neither MFS nor the Trustees had taken any action.

41.    These events have had and will have a series of deleterious effects on the MFS family of mutual funds, including but not limited to:

(a)    Loss of confidence of the investing public in the integrity and management of the Funds, thereby resulting in the Funds losing NAV and market value.

(b)    As a result of Defendants' misconduct, the Funds are exposed to significant regulatory scrutiny and to suit by investors for losses resulting from Defendants' misconduct, thereby, at a minimum, causing the Funds to incur unnecessary direct and indirect investigatory, litigation and administrative costs, and potentially resulting in awards, judgments or settlements against the Funds.

## DEMAND EXCUSED ALLEGATIONS

42.    The Plaintiff has not made demand upon the Trustees to bring an action against the MFS Defendants, and other culpable parties to remedy such wrongdoing.

(a)    Demand is excused because no such demand is required for the Plaintiff to assert a federal claim under Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), for breach of fiduciary duty in connection with the compensation and other payments paid to MFS.

(b)    Demand is also excused because the unlawful acts and practices alleged herein are not subject to the protection of any business judgment rule and could not be ratified, approved, or condoned by disinterested and informed directors under any circumstances.

(c)    Demand is also excused because the unlawful acts and practices alleged herein involve self-dealing on the part of the MFS Defendants and its directors and officers, who manage and control the day-to-day affairs of the trusts and the Funds.

(d)    Demand upon the Trustees is also excused because the Trustees are all hand-picked by MFS management, and thus owe their positions as well as their loyalties solely to MFS management and lack sufficient independence to exercise business judgment. Because the Trustees oversee 66 separate funds, the Trustees derive substantial revenue and other benefits for their services.

(e)    Finally, demand is excused because such demand would be futile. The unlawful acts and practices alleged herein have been the subject of an intense investigation by the SEC and the New York Attorney General. Consequently, the MFS defendants and the Sun Life defendants have already been informed of the wrongdoing alleged herein and have failed and refused to take appropriate action to recover damages for the Funds. Moreover, MFS's lackadaisical response is clearly insufficient and demonstrative of the conflicts, and true allegiances, of the Trustees. By failing to take action before the federal and state investigations, the MFS defendants and the Trustees acquiesced in or condoned such conduct. No shareholder demand would reasonably have caused them to change their complicit disregard for the wrongdoing.